M.D. v. West Side GI, LLC, Council. May it please the Court. Good morning. My name is Elizabeth Shieldcret and I represent Dr. Indira Kairam. This case involves a series of transactions, some of which are employment, but some of which are also business transactions between the parties. And I just wanted to focus on something that I think the district court judge didn't understand very clearly, which is the way insurers pay doctors, and you may have experienced this too, they pay a procedure fee to the doctor for performing the procedure. They also pay a facility fee, for example, to the hospital for having nurses in sterile conditions. And those are billed separately. And you may have seen that when you get your explanation of benefits, that there's multiple fees involved. The district court didn't understand that Dr. Kairam, when she performs procedures at the ASC, which is an ambulatory surgical center, it's sort of a step down from a hospital, but still a higher level of care, for example, infection control. That wasn't in your complaint. You didn't put in. In the complaint, you simply refer to the fact of business being referred, not to these particular fees. Right. So in, it's paragraph 16 of the pleading, it's A20 to 21. I looked at that paragraph. That dealt with her former work at ASC, it had nothing to do with her current work. Right. And at oral argument, you were asked specifically by the magistrate judge and said, quote, she received income in proportion to her ownership interest in WSGI, not the cases she performed. That's A130. So how is the magistrate judge supposed to know this? Because that's the way all procedures are billed. It wasn't, I mean, the defendant certainly understood that. But that's just the way insurers, what we say is what happened before she joined the practice was the insurer paid the procedure fee to her and then an extra facility fee. Was she supposed to take judicial notice of that? I don't, when you say that's the way it happens, all you had to do was plead that. If that's true, then all it means is if we can amend, we can put that in because that's the way it happened. We thought the defendant understood that and that it was clear, but if it's not clear, we can certainly put that in to make it more clear. But everyone in this industry understands that the procedure fees are paid directly to the doctor. So when they deny her procedures, they've denied her income. She has two streams of income, one from her partnership share and one from performing the procedures. Yes. Is that correct? That's correct, Your Honor. And so I think, as I said, we can amend, but I think below in the context of what Westside pays her, it is straight partnership share, but in the context of her total income, it's the insurers, the contracts that she has with the insurers are paying her directly the procedure fees. So any time Westside denies her a procedure, that's denying her income. The other thing I wanted to focus on is that there are, under Rule 12 motion, the district court engaged in impermissible fact-finding, and one of the things the district court said was there just is no trade secret here. The court cannot make that determination. They could say we didn't sufficiently plead it, but they can't. They can't keep it confidential. So having a confidentiality agreement has never been a requirement. She shared her alleged trade secret with the practice. That's right, and there was a confidentiality agreement with the practice as part of the A78-79. It didn't deal with client information that wasn't specific to the template, right? It covered whatever information, whatever valuable information was shared with the practice, and it went both ways. It was a mutual agreement. But nothing, the only thing you said about the template is in paragraph 24 saying she provided the template that she had developed to optimize billing. How is a court supposed to determine whether you have a plausible claim for a trade secret where that's the only thing in your complaint about the template? There's nothing else about the template in the complaint. So optimizing billing is a valuable, is something of value, and the cases that have dealt with this have found things such as customer lists if they're kept confidential. They've also found technical data, internal pricing information, work product, research, engineering designs as being sufficient pleading to show trade secrets. All I have to say is I gave them a template, and that's a plausible trade secret claim. If you say nothing else, I gave them a template. Again, if it's a question of pleading, then we can certainly amend to say what she gave them with the template, and it puts them on notice of what exactly it is that she's saying is the trade secret. But it's also the expertise to use the template. It's the system of working, knowing how to work with the insurers, how to address, for example, denials and resubmit claims and shepherd the claims through the process. We can definitely give more information about that, but you're not required to disclose exactly what the trade secret is. The template as the embodiment of that was something that the defendant has, and it puts them on notice of what things are part of the trade secret. But we could certainly elaborate on that. That's not a basis for saying the claim is futile. You certainly can't say there's no trade secret there. All you can say is we didn't plead it sufficiently. Why didn't you tell the court that you had additional details on those things that you could add? There was a very lengthy oral argument, and I didn't see any details you said when the court started asking you questions about that. You didn't say, well, we have these facts, those facts, so that the court would know that it wouldn't be futile. I wish I had. I'm sorry that we didn't, but we thought that at least the court understood that determining whether something's a trade secret is a complex process. It's not something you do on the pleadings, and we gave, by pointing to the template, sufficient notice to the defendant of what it is we're talking about, what kinds of things are covered. You don't deny that WSGI acquired the template through entirely proper means, do you? No. They induced her by offering her this part-time position based on knowing that she had this billing expertise. They induced her to reveal the trade secret, and then they never paid her for it. Right. So that sounds more like a breach of contract than a violation of trade secrets. Well, many trade secret claims lie in breach of contract as well. Every time an employee leaves and a company says, wait, you can't use the trade secret of the next employer, they're often also something where they're breaching an agreement. That doesn't mean it's not also a trade secret claim, but because the DTSA is new, they're really isn't law on that in the circuit. But traditional trade secret claims also lie in breach of contract. That's true. Counselor, can you touch on the age claim and just describe why it shouldn't be dismissed for lack of rightness? So there are two things that are pleaded in the age claim. There's rarely a statement, a smoking gun statement of animus like there is in this case on 898-99 where they say, we want to get rid of the older doctors. That rarely happens. And your client isn't 70 yet, so why shouldn't this claim be dismissed for a lack of rightness? So at a minimum, what she pleads is that the older doctors in the practice then were not given cases. So there was animus that's not even related to specifically the retirement policy, but just the wanting to push the older doctors out, and she doesn't need to be 70 for that. We pleaded that they didn't refer cases to the two oldest doctors in the practice. But also, the reason is because these are shares and there's a market for the shares, which is, we know that because there was an outside investor who valued the shares. When she went to say, fine, if I have to retire, she went to her partners and said, I'll sell you the shares, we have a valuation, they didn't want to take them anywhere near the market price. She has already suffered that loss. And in any other case, when there isn't a broader market for the shares, you'd say, they know they're just going to hold out because they can force her to sell at 70. And again, that's a policy that was implemented. We pleaded in the complaint. Not the mandatory retirement. Yes, we plead at paragraph 30, it's 824 to 825, that it was implemented. And the reason it was implemented is because it does not require a vote of the membership to amend the operating agreement. It was implemented under, this is at A65, either section 6.1A or 6.2 of the operating agreement, where the board, and they say this was a unanimous vote, the board can implement the policy. And that's what happened. And they told doctors they implemented the policy. And so, what they're talking about is, maybe on the second vote, they didn't all, what they're saying is, they didn't sign the written agreement. Well, we can't know that at the pleading stage. We'd have to either get the documents or depose the people. The court essentially accepted a negative. You say it's implemented, if she's still working there, the only other doctor who's over 70 is also still working there. How is it implemented? Nobody has been subject to this mandatory retirement policy. How is it implemented? It's implemented because the board passed it, and they can, and we expect will, start pushing doctors out. I mean, in some sense, the lawsuit has had, it seems, a premature claim, though. Well, not in the sense that they've already started denying the older doctors' cases. And so, there's already been some discrimination, not in the sense that the older doctors can't realize their share value. It wasn't in your complaint. Your complaint was that they implemented a mandatory retirement age. Now you're adding this idea that they're not getting cases. So, that's... That's in the complaint, a paragraph, I think it's 29 or 30. We said they stopped funneling cases to the older doctors. You've reserved three minutes for rebuttal. Yes. Thank you, Your Honor. We're from WSGI. Good morning, and may it please the court. My name is Jeffrey Kamhai, and I represent Appellee Westside GI. The appellant has attempted to force this case into federal court, which she believes to be a favorable venue. She has been given multiple bites at the apple, and quite frankly, at this point, is down to the core. Yet, she has consistently failed to even adequately plead a single federal claim. What about her claim that he didn't look like the doctors who were getting the procedures assigned to them? Sure. Appellant's claim is based on an alleged... It sounds to me like it's discriminatory atoms. It's based on a single comment allegedly made by one of the board members. It's dramatic. Fair, but... A single comment, if it's bad enough, is enough. But appellant's claim is undercut by the fact that she also states in the complaint that Dr. Goldberg was not referred patients from the Gould practice. Dr. Goldberg is a white male, therefore undercutting any inference of discrimination. I'm sorry. We discriminate against older white males, but they discriminated against her by not giving her these procedures because she didn't look like Dr. Gould, a white male, and the parties want to see a doctor that looks like Dr. Gould. But there's no, then, support for... There's no comparator there that she can point to, or the comparator she does point to is a white male who was not referred patients as well, therefore undercutting her claim that the basis of the decision as to who to refer patients to from the Gould practice relates in any way to race, national origin, gender. They told her it relates to her gender. They told her. They said, we're not signing these to you because you don't look like the white males that Dr. Gould's practice was made up of. That's, yes, that's the allegation, but again, there's no, yes, Westside denies that that was said. And quite frankly, the bulk of cases from the Gould practice are assigned to... So you know we have to take as true any pleaded allegations at this stage of the procedure. So they said this at a meeting of doctors. They said, we're not giving you procedures because you're not a white male, and Dr. Gould's patients want a white male to do their procedures. Understood. And as Westside does deny that, but accepting that as true, does not believe that that sufficiently pleads a claim given how, given the other comparators, the other doctors in the practice. Well, she only compared it to the one doctors. What about all the white male doctors that got these procedures? Who did Dr. Distler send them? Again, that goes outside the bounds, but the gross majority of those claims were referred to female doctors who are non-white. Well that's extra record, as you point out. All right. Understood. I'm just trying to respond to the court's question. Yes, go on. Counselor, isn't it a very liberal standard to be able to replead a complaint, and why shouldn't that be allowed here? There is, but the standard says that it should be freely given if in the interest of justice. This would now be an appellant's fourth attempt to state a federal cause of action. She has filed a complaint, an amended complaint, a second amended complaint, each time attempting to add new claims that might push this case into the federal court, but she has been unable to make out any of those claims. And no adjudication. She's never received the guidance of any court with respect to any of those claims, right? With respect to any other than the EPA claim, the EPA claim was amended after a pre-motion letter. But this is the first time a court could say, these are too conclusory, or you haven't shown ripeness where normally a litigant would get an opportunity to add details. There's nothing particularly fatal about not having details, right? And at the oral argument, counsel, although I did point out, counsel didn't say, we can fix it this way, we can fix it that way. Three times she did make reference during the oral argument to wanting to replead, so. But there are elements of each of her claims that render amendment futile. Equal Pay Act, for example, Dr. Disler, they just described as having administrative duties. So you could add more details to what his duties were to try to show that they are substantially similar to the plaintiff. Understood. I would respond to that in two ways. The first to say that the only role that Dr. Disler, or the only duty that he had that is elucidated in the second amended complaint, is that he referred patients from the Gould practice to doctors, which is already a duty that falls outside the scope of what appellant was doing with regard to the billing work. But to take your point, even if it was amendable to show that those two jobs were substantially similar, there's a second element to her claim under that statute that renders it futile because she doesn't allege that there were different wages paid to female doctors and male doctors. That argument is made without any support in the law, and it's contrary to the statutory language. The statutory language refers to being paid equal wages, right? It doesn't make reference to offering to pay someone wages. Your position is if someone says, I'm going to pay you the same as a man, but never does, that you don't have an equal pay act claim. There's no case that would suggest that, and it's contrary to the statutory language. So appellant points to the statutory language, but ignores that in three places, the language of the EPA specifically refers to the wage rate. That, coupled with the narrow scope of the EPA and its purpose in eliminating sort of an imbalance in bargaining power between female and male employees. It wants to eliminate unequal pay, right? It's under the FLSA, right? It's under the FLSA. So under the FLSA, if an employer says to an employee, I'm going to pay you overtime, but then never pays the employee overtime, under your reading of the statutory language, that employee would have no FLSA claim, would have to go to state court for breach of contract. They would have a failure to be paid overtime, but not an equal pay act claim. I know, but you're relying on this idea that if there's an agreement to pay a certain amount, that it's only a breach of contract, right? It would be a breach of contract claim. Yes, that's the position. It can also be a violation of the equal pay act is what I'm suggesting. But that, again, I think that would go counter to the narrow scope of the EPA. Under that concept, you would then create a situation where any time there's a female employee who doesn't receive a certain wage, it would automatically trigger a claim under the equal pay act. That female employee would have to point to a male who is being paid. Right. But it's not just not being paid a particular wage. If there's no male counterpart, then you would just have a breach of contract. But if she could say, and that male for the same job received more than I did, then it would be an equal pay act. Correct. In my hypothetical, I was assuming the existence of other employees who received the same wages. It would essentially render a wage error, an equal pay act claim, which I think runs counter to the narrow scope of that law. Moreover, I would continue that the law itself is concerned with the rate of pay. And here, both Dr. Khairum and Dr. Dissler were offered the exact same rate of pay for the work that they were doing. And therefore, it doesn't trigger a claim as the district court correctly held under the equal pay act. I wanted to touch quickly on the Defend Trade Secrets Act claim. Plaintiff appellant just stated that she could attempt to amend that claim. But again, I think there's a portion of that claim that amendment would be futile. Appellant has not stated that she took any steps in order to keep her template confidential. There was no confidentiality agreement, no password protection. It was not limited to a certain number of users. Those things can't be amended in a complaint. If they didn't occur, they simply didn't occur. So amendment would be futile on that regard. She points to the confidentiality provision in Exhibit 2 to her complaint. What's your response to that? Yes, she does. I mean, that's a general confidentiality provision regarding information in the initial agreement from 2014 between appellant and Westside. It has no specific reference to the template, nor did appellant bring up any confidentiality concerns regarding the template when she voluntarily presented it to Westside. She said she was never paid for the work she did on the template, but that's breach of contract, isn't it? Westside would agree with that, yes. But it's not DTSA? Correct. To the extent that appellant claims that she has not been paid any promised salary for her work in the billing department, we would agree with the district court that, at best for her and worst for us, that's a breach of contract claim. And I see that my time is up. There are any other questions? Thank you. Thank you. Counsel, you have three minutes. Thank you, Your Honors. I just want to point out, a Title VII claim does not require a comparator. An EPA claim does. And I just want to make sure there's no confusion about that. So we pleaded a comparator for the EPA claim, but it's not an element of a Title VII claim. With the DTSA claim, a confidentiality agreement is not required. And in fact, anyone who works in billing understands that all of this is confidential. That's the way all of these businesses, including outside contractors, handle the information. And this Court has always, over the last 60 years, has held that a confidentiality agreement is not required. The context can be enough. And that's the Emory v. Marcan Products case, which sophisticated employees should know. And in fact, her disclosure was to the billing committee. It was not to all of the doctors where they could use it in their individual practices as well. This was in the context of she was hired to do a job to improve the recovery rate in billing. And so there was actually an understood from the entire relationship, the operating agreement covers confidential information. And in this specific context, because it was a limited disclosure for a specified purpose to people who absolutely knew that that information was confidential. And the other thing I would point out, the District Court judge had actually sent this  request. And when she reviewed it, her standard in many places, and she covers this in A185 of the record, she is only reviewing for an abuse of discretion. That is not a standard that this Court has ever said is correct. When there are objections, it's de novo review. And there are many places where not only does she adopt fact findings, which is improper to do, but she also gives deference to someone who's not an Article III judge who cannot decide a motion to dismiss. And that alone, we think, would at least require a remand to look at what she did. But we also think that there's enough in this pleadings or what could be pleaded, and we show that in our papers, that really should be reversed and we should have an opportunity to amend. Why were the federal claims only added in your third complaint, your second amended complaint? Why weren't they in there initially? Isn't this really a case where when you discovered there was no diversity jurisdiction, you were searching for federal claims to stay in federal court? Why weren't they in there in the beginning? No, Your Honor, but what precipitated the complaint being filed was this deal that was supposed to go through. And we actually thought that we may need an injunction based on what the parties were telling us about what they were going to do to the older doctors if the deal went through. And so we wanted to know that there was a judge assigned to the case, and we would go back and amend. And in doing, going through all of the claims, more kept, in investigating the claims, we found that there was more going on, and that's why they were added after. In addition, we had to do the filing with the EEOC. Thank you. Thank you, Your Honor. This is a lively case.   Thank you. Thank you.